Philip R. WORKMAN, Petitioner–
Appellant,

v.

Ricky BELL, Respondent–Appellee.

No. 96–6652.

United States Court of Appeals,
Sixth Circuit.

Argued June 17, 1998.

Decided Oct. 30, 1998.

Saul C. Belz (briefed), Waring Cox, Memphis, TN, Christopher M. Minton (argued and briefed), Office of Post–Conviction Defender, Nashville, TN, for Philip R. Workman.

Gordon W. Smith (argued and briefed), Asst.Atty.Gen., John Knox Walkup (briefed), Atty.Gen., Glenn R. Pruden, John H. Baker, III, Michael E. Moore (briefed), Office of Atty.Gen., Criminal Justice Division, Nashville, TN, for Ricky Bell.

Before: NELSON, RYAN, and SILER, Circuit Judges.

SILER, Circuit Judge.

The petitioner, Philip R. Workman, under a death sentence, appeals the denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He has raised numerous issues. For the reasons stated herein, we **AFFIRM** the judgment of the district court.

## I. Background

The facts surrounding Workman's conviction are stated by the Tennessee Supreme Court in *State v. Workman,* 667 S.W.2d 44,

46–47 (Tenn.), *cert. denied, Workman v. Tennessee,* 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984)(*"Workman I "*).

Workman was convicted of the felony murder of Lt. Ronald Oliver of the Memphis Police Department in connection with a robbery of a Wendy's restaurant. During sentencing, he presented no evidence of mitigating circumstances. The jury recommended a sentence of death, finding five statutory aggravating circumstances:

a) The defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder, Tenn. Code Ann. § 39–2–203(i)(3);

b) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another, Tenn. Code Ann. § 39–2–203(i)(6);

c) The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, the offense of robbery, Tenn. Code Ann. § 39–2–203(i)(7);

d) The murder was committed by the defendant while in lawful custody or in a place of lawful confinement or during the defendant's escape from lawful custody or from a lawful place of confinement, Tenn.Code Ann. § 39–2–203(i)(8); and

e) The murder was committed against any law enforcement officer, corrections official, corrections employee or firefighter, who was engaged in the performance of official duties, and the defendant knew or reasonably should have known that such victim was a law enforcement officer, corrections official, corrections employee or firefighter engaged in the performance of official duties, Tenn.Code Ann. § 39–2–203(i)(9).

*Workman v. State,* 868 S.W.2d 705, 707–08 (Tenn.Crim.App.1993)(*"Workman III "*). The Tennessee Supreme Court affirmed the

conviction and sentence. *Workman I,* 667 S.W.2d 44.

In 1986, the Shelby County Criminal Court denied Workman's first petition for post-conviction relief. On appeal, the Court of Criminal Appeals affirmed the trial court, finding that some claims were without merit, some claims were waived, and the remaining claims were previously determined. *Workman v. State,* C.C.A. No. 111, 1987 WL 6724 (Tenn.Crim.App., Feb. 18, 1987)(*"Workman II "*). The Tennessee Supreme Court denied permission to appeal, and the United States Supreme Court denied certiorari. *Workman v. Tennessee,* 484 U.S. 873, 108 S.Ct. 209, 98 L.Ed.2d 160 (1987).

In 1992, the Shelby County Criminal Court denied Workman's second petition for post-conviction relief. The Court of Criminal Appeals affirmed, *Workman III,* 868 S.W.2d 705, 707–08, and the Tennessee Supreme Court denied permission to appeal. Later, the United States Supreme Court denied certiorari. *Workman v. Tennessee,* 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 555 (1994).

In 1994, Workman filed a petition for a writ of habeas corpus in the United States District Court for the Western District of Tennessee pursuant to 28 U.S.C. § 2254. In 1996, the district court denied the petition, finding that some issues were defaulted and that the remaining were meritless. Workman has appealed to this court, focusing his attention on five issues. He has also presented a number of succinct issues without much discussion or argument.

## II. Discussion

### A. Standard of Review

 This court reviews the district court's denial of a writ by summary judgment *de novo. See Hartleip v. McNeilab, Inc.,* 83 F.3d 767, 774 (6th Cir.1996) (citing *E.E.O.C. v. University of Detroit,* 904 F.2d 331, 334 (6th Cir.1990)). Furthermore, review of this writ of habeas corpus petition is governed by 28 U.S.C. § 2254. Pursuant to § 2254(d), the state court's factual findings are presumed to be correct unless Workman can demonstrate one or more of the eight exceptions listed in the statute. *Marshall v.*

*Lonberger,* 459 U.S. 422, 432, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983).

### B. Withholding of Evidence/ Presenting False Evidence

Workman claims that the prosecution both presented false evidence and withheld exculpatory evidence during his trial. He alleges that the prosecution presented false testimony, withheld documents, did not disclose statements by witnesses, and fabricated evidence in an effort to keep the jury from discovering that an officer struck him on the head while he was trying to surrender and that someone else, namely Memphis Police Officer Aubrey Stoddard or Stephen Parker, shot Lt. Oliver. Because both of these theories have been consolidated into a single argument, Workman's allegations will be presented together.

Through the affidavit of Dr. Kris Sperry, Workman now contends that the fatal wound in Lt. Oliver was not consistent with that typically received from a .45 caliber hollow point bullet like the one fired by Workman. Specifically, Dr. Sperry claims that the exit wound found in Lt. Oliver was slightly smaller than the entry wound, whereas the typical exit wound is significantly larger than the entry wound. Workman thus concludes that the prosecution must have presented false evidence concerning the source of Lt. Oliver's wound.

Workman also contends that a prosecution witness, Harold Davis, a black man, was not present when the incident between Workman and the officers occurred. Davis testified that Workman shot Lt. Oliver. Workman points out that five witnesses, Steve Craig, Kerry Kill, Garvin Null, Officer Parker, and Officer Stoddard, have indicated that they did not see Davis at the scene. Workman further notes that police reports taken at the scene do not mention Davis or his vehicle. Moreover, a crime scene diagram does not indicate the presence of Davis's car. Finally, Workman notes that Davis did not attend the lineup held immediately after Workman's capture, but instead viewed a photograph array approximately sixteen hours after the incident. Therefore, according to Workman,

Davis must have been "planted" by the prosecution.

Workman also claims that the prosecution withheld evidence that Officer Parker fired his shotgun during the incident. For support, he cites police documents, Craig's testimony and medical records from the hospital where he was taken after the incident. The police document indicates that Parker carried a shotgun. Craig stated that he saw Parker fire his shotgun. The emergency medical records indicate that Workman was treated for shotgun wounds to his buttocks.

Finally, Workman contends that the prosecution withheld evidence that he was bludgeoned by Officer Stoddard with a flashlight while he was attempting to surrender. In this regard, he alleges that Officers Stoddard and Parker committed perjury and that the state withheld the statements of three witnesses not called at trial—Null, Jeff Rickard, and Craig.

From this evidence, Workman generally concludes that he did not shoot Lt. Oliver, but that Lt. Oliver was shot by either Officer Stoddard or Officer Parker. However, Workman testified during trial that he shot Lt. Oliver. Clearly, any attempt to retract this confession must be viewed skeptically.

The "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (citations and internal quotations omitted). This rule applies to both the solicitation of false testimony and the knowing acquiescence in false testimony. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). In order to prove this claim, Workman must show that (1) the evidence the prosecution presented was false; (2) the prosecution knew it was false; and (3) the false evidence was material. *United States v. Hawkins*, 969 F.2d 169, 175 (6th Cir.1992).

In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Notwithstanding a *Brady* request, the prosecution is under a duty to disclose exculpatory evidence that, when viewed in the context of the entire record, "creates a reasonable doubt that did not otherwise exist." *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). No *Brady* violation occurs, however, "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source." *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991) (citations and internal quotations omitted).

The respondent, Warden Ricky Bell ("State"), claims that Workman has defaulted these claims because he failed to raise them prior to his second post-conviction proceeding. Workman did, in fact, only raise these issues for the first time there, and the Shelby County Criminal Court determined that they were waived pursuant to Tenn.Code Ann. § 40–30–112(b). Workman argues that the Tennessee Court of Criminal Appeals addressed the merits of these claims in *Workman III*, 868 S.W.2d at 709–711, and that these claims are therefore not waived.

If a state court reaches the merits of a federal claim, then the claim is not defaulted. *See Wainwright v. Witt*, 469 U.S. 412, 431 n. 11, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) ("[W]here the state courts do not rely on independent state grounds for disposing of a claim and instead reach the merits of a federal question, the federal question is properly before us."). The district court determined that the decision of the Court of Criminal Appeals was based in part on state law and in part on federal law, and that "given the intertwine of federal and state law, no

default would apply because of [the] plain statement requirement." This is a proper conclusion. The Tennessee Court of Criminal Appeals reached the merits of this claim. *Workman III,* 868 S.W.2d at 709–710. Therefore, Workman has preserved this issue for review.

 The weapon fired by Workman on the night he robbed the restaurant was a .45 caliber Colt Commander semi-automatic pistol loaded with aluminum jacketed "silver tip" hollow point bullets. These bullets, which have a soft lead core, are designed to expand, or "mushroom," upon entering the human body. Thus an F.B.I. agent who fired silver tip hollow point bullets from Workman's pistol into a water tank told the jury, in describing the condition of the bullets after they had been retrieved from the tank, that "[t]he bullets have mushroomed, being hollow-point bullets, and have had a portion of the jacket mutilated and separated from the original jacket."

Dr. Sperry, the Fulton County Deputy Chief Medical Examiner in Atlanta, Georgia, gave Workman's lawyers an affidavit on this subject in 1995. He attested that in the course of his work as a medical examiner he has seen some 30 to 40 corpses with wounds from ammunition of the sort Workman used; that in every one of these cases, "the .45 silver tip hollow point bullet expanded upon entering the human body involved"; that approximately 90 percent of the time, the hollow point bullet never emerged from the victim's body at all; that "[i]n the remaining instances [*i.e.,* the remaining three or· four cases], the exit wound created by the .45 silver tip hollow point bullet was significantly larger than the entrance wound the bullet created"; and that it would be inconsistent with the exit wounds seen by Dr. Sperry for a .45 silver tip hollow point bullet to create an exit wound smaller than the entry wound.

The report of the autopsy on Lt. Oliver's body describes both an entry wound and an exit wound. Dr. James Bell, the medical examiner who performed the autopsy, testified at trial that the entry wound (which was in the front of the chest) was half an inch in diameter and was "sort of rounded...." The exit wound, in contrast, was a "sort of slit-like tear in the skin" less than a quarter of an inch in length.

If a .45 caliber hollow point bullet had gone all the way through Lt. Oliver's chest and emerged in one piece, we have no doubt that the exit wound would have been larger than the entry wound. It hardly follows, however, that Lt. Oliver could not have been shot with the type of ammunition Workman was firing—because the record in no way compels the conclusion that the bullet which killed the officer emerged from his body in one piece.

Soft point bullets sometimes shed fragments after entering a human body. See, for example, the paper on "Ballistic Injury" presented by Col. Martin L. Fackler, of the U.S. Army Medical Corps, at the March 1986 Symposium of the American College of Emergency Physicians. The paper, accepted for publication in the *Annals of Emergency Medicine,* describes one soft point bullet wound where the percentage of bullet fragmentation was calculated at 33.4 percent. Dr. Fackler gives the following description:

> As the bullet deforms on impact, small pieces of it separate. In this case, 33.4% of the bullet's total weight leaves the main mass in the form of fragments. Each fragment crushes its own path through tissue as the multiple fragments spread out laterally away from the main projectile.

If part of the bullet that killed Lt. Oliver remained in the officer's body, that would be entirely consistent with Dr. Sperry's observation that hollow point bullets remain inside the victim's body about 90 percent of the time. Dr. Bell did not recover any bullet segment, to be sure, but no x-ray was taken and the small piece of metal could simply have been overlooked. Dr. Bell did report a gunshot wound fracture of Lt. Oliver's left seventh rib, so the bullet may have fragmented on striking the rib. But regardless of when any fragmentation may have occurred, the most obvious explanation of the quarter inch "slit-like tear in the skin" on Lt. Oliver's back is that the wound was caused by the exit of a hollow point bullet fragment (possibly part of the aluminum jacket) and not by the exit of an entire bullet. Therefore, there is no reason to conclude that Workman was

actually innocent of causing Lt. Oliver's mortal wound, just as there is no reason to conclude that the prosecution knowingly presented false evidence in this connection.

The district court correctly found that Dr. Sperry's testimony did "not state that Oliver's wound could not have been caused by petitioner's weapon, nor does it offer an opinion that the wound was caused by the weapons of Stoddard or Parker or that it was consistent with wounds created by such weapons." Furthermore, Dr. Sperry's testimony simply "represents a view arguably different from that given by the state's expert witness at trial." Assuming that Dr. Sperry's observations are credited, Workman has presented no evidence that the prosecution knowingly presented false evidence in this regard. He has simply shown that there may be different interpretations of the physical evidence. As Workman cannot demonstrate falsity, he cannot prevail on this argument. *See Hawkins,* 969 F.2d at 175.

 The district court also correctly concluded that the fact that several witnesses did not mention seeing Davis establishes neither his presence nor absence at the scene. Specifically, it found that Officer Stoddard's failure to see Davis is understandable because he was involved in an altercation with Workman and was ultimately shot by him, the other witnesses Workman produced were busy helping the officers, and therefore it was also understandable that they did not see Davis. Furthermore, Workman presents no evidence that, assuming Davis presented false testimony, the prosecution had knowledge of its falsity. Finally, Davis's testimony merely corroborated Workman's own trial testimony that he shot Lt. Oliver.

 Workman is correct that Parker carried a shotgun, and that Craig stated that Parker fired it. Furthermore, hospital records indicate that Workman was treated for a shotgun wound. However, it does not seem that the prosecution concealed this fact or that it was material to the issue of whether Workman shot Lt. Oliver. Even Dr. Sperry does not theorize that Lt. Oliver was killed with buckshot. Finally, it is not *Brady* material, as Workman knew he was hit by gunfire from a shotgun.

Workman's evidence that he was bludgeoned by Officer Stoddard while he was trying to escape is irrelevant. Assuming that Stoddard struck Workman with his flashlight during the struggle, Workman cannot establish why this would be material to his claim.

In sum, Workman has failed to prove the evidence was false, the prosecution knew it was false, or how it is material. *See Hawkins,* 969 F.2d at 175. In regard to the evidence he claims was withheld, he has failed to show that it had any value whatsoever.

## C. Ineffective Assistance of Counsel

Workman claims that his trial counsel was ineffective during the guilt phase of the proceeding because his counsel: (1) failed to ascertain whether Lt. Oliver's wounds were caused by Workman's ammunition; (2) failed to ask Garvin Null whether he saw any person at the scene who could have been Davis; (3) failed to interview Kerry Kill about Davis's presence; (4) failed to challenge Davis's testimony with Officers Stoddard's and Parker's testimony that they did not see him at the scene, as well as with documents showing that Davis did not participate in the first lineup, and diagrams which did not show that Davis's car was in the Wendy's parking lot; (5) failed to present evidence that the officers bludgeoned Workman; and (6) failed to present evidence that Stoddard and Parker both fired weapons.

 In order to determine that a convicted defendant's representation at trial was so defective that it requires reversal of the defendant's conviction,

[f]irst, the defendant must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defendant. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is

reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Furthermore, "a court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052.

Counsel must make a reasonable investigation into the facts and circumstances of the crime, or make a reasonable decision that a particular investigation is not necessary. *Sims v. Livesay,* 970 F.2d 1575, 1580 (6th Cir.1992). However, "a particular decision not to investigate must be directly assessed for reasonableness in all of the circumstances, applying a heavy measure of deference to counsel's judgment." *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052.

As to allegation (1), Workman again offers the affidavit of Dr. Sperry. Workman claims that his trial counsel should have discovered such evidence. However, as noted by the district court, Workman's theory at trial was that he was attempting to surrender when he accidentally shot Lt. Oliver, so a theory that Workman did not kill Oliver would have been inconsistent with the defense. Thus a decision not to pursue that theory is a reasonable, tactical decision.

As to allegations (2)-(6), these claims are fashioned around Workman's claim that Parker shot Lt. Oliver and that he was bludgeoned by Stoddard as he attempted to surrender. As mentioned, this theory amounts to nothing more than second-guessing his trial tactic of confessing to the robbery and murder and presenting evidence of drug intoxication. A claim of ineffective trial counsel should not be used as a vehicle to retract his confession and change his story. Consequently, Workman has not shown that his trial counsel's performance was deficient under *Strickland.*

Workman also claims that his counsel was ineffective during sentencing because he failed to adequately investigate and present mitigating evidence of his back-

ground and character consisting of his drug addiction, diminished mental capacity, and family history. As for deficient performance and prejudice at sentencing, prejudice exists when "there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

Workman alleges that his counsel, before evidence was presented during sentencing, told the jury that he would present proof of mitigating circumstances, but then offered no such proof. The prosecution subsequently commented to the jury that Workman presented no mitigating circumstances although Workman could have submitted "anything in the world to prove mitigation."

Workman claims that there are numerous mitigating factors, including his drug use, diminished capacity and tragic family background, that should have been presented to the jury. Indeed, Workman now presents very compelling mitigating evidence. *Id.* However, the arguments Workman presents here have already been addressed.

Workman has previously argued that his counsel was deficient for failing to present evidence of drug use and dependency. In *Workman II,* the Tennessee Court of Criminal Appeals discussed Workman's counsel's decision not to present mitigating circumstances relating to drug use.

> Thompson [Workman's trial counsel] testified that his office paid to have the petitioner examined by a psychiatrist and a psychologist, neither of whom would have helped petitioner. Both the petitioner and his wife testified in detail about his drug addiction during the guilt phase of the trial. Mr. Thompson stated that they had no additional proof to be presented at the sentencing phase. Defense counsel considered having petitioner's brother testify but decided not to use him because on cross-examination the brother might incriminate the petitioner in other crimes.

* * *

Mr. Jones testified that they thoroughly cross-examined each State's witness concerning petitioner's appearance and condition at the time of the robbery and murder.

*Workman II,* 1987 WL 6724 at *2–3. The court concluded that these were reasonable tactical decisions left to the discretion of counsel. *Id.*

The district court addressed Workman's claim that his counsel failed to adequately investigate and present mitigating factors relating to his diminished capacity and family history. After citing evidence of Workman's counsel's activities relating to preparing a mitigation defense, the district court found:

[f]irst, it is clear the defense team diligently pursued numerous angles for presenting a mitigation defense, including interviewing various family members, psychologists, and medical personnel familiar with petitioner's background. Second, despite many conferences with petitioner, it appears from counsel's files that petitioner never advised his lawyers of the history of abuse that he now presents.... Third, the defense team ordered two psychological exams.... Fourth, the evidence indicates a strong strategic reason for not pursuing investigations into petitioner's capacity; that is, counsel deliberately decided to avoid a diminished capacity defense in order to avoid introduction of evidence of petitioner's antisocial personality. Clearly, such evidence would undermine counsel's contrary efforts to present petitioner as a scared, intoxicated and inadequate individual acting atypically.... To the extent that counsel failed to investigate the details of petitioner's childhood, clearly those failures resulted either from petitioner's own conduct, or from reasoned decisions not to pursue fruitless, perhaps harmful, inquiries.

 Failing to present any mitigating evidence is disfavored. *See Austin v. Bell,* 126 F.3d 843, 848 (6th Cir.1997)("The Constitution ... requires defense counsel to reasonably investigate a defendant's background and present it to the jury. Failure to investigate or present mitigating evidence at sen-

tencing may constitute ineffective assistance of counsel."). However, it is clear that Workman's trial counsel investigated his background and character but determined for tactical reasons not to present such information to the jury. Furthermore, Workman himself had very little information to offer his trial counsel regarding his family history. Counsel cannot be said to have been ineffective simply because Workman now offers evidence of mitigation.

 Workman further claims that counsel on direct appeal was ineffective because he failed to raise various issues. Appellate counsel "need not advance every argument, regardless of merit, urged by the appellant." *Evitts v. Lucey,* 469 U.S. 387, 394, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985)(emphasis in original). Furthermore, there is no constitutional right to have every nonfrivolous issue raised on appeal, *Jones v. Barnes,* 463 U.S. 745, 750–54, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), and tactical choices regarding issues raised on appeal are properly left to the sound professional judgment of counsel. *United States v. Perry,* 908 F.2d 56, 59 (6th Cir.1990).

 The State argues that Workman has defaulted his claim of ineffective assistance of appellate counsel because he did not raise this particular claim in his first petition for post-conviction relief. Workman did raise a claim of ineffective assistance of counsel in his first petition for post-conviction relief, but he only alleged that his counsel mishandled the petition for a writ of certiorari to the United States Supreme Court. However, Workman did raise the issue presented here in his second petition for post-conviction relief, and the trial court found the claim to be "previously determined." Furthermore, Workman appealed this ruling, but the Tennessee Court of Criminal Appeals did not address this argument. Given the lack of a clear statement of default, and the confusing nature of this issue's history, we shall address the merits of Workman's claim of ineffective assistance of appellate counsel.

 Workman provides no support for this claim. His allegation is merely concluso-

ry. Furthermore, his counsel raised nineteen issues and numerous subissues on direct appeal. *See Workman I,* 667 S.W.2d at 46. In sum, Workman's counsel was not ineffective at trial or on appeal.

### D. Interference With Defense

Workman claims that the prosecution interfered with defense counsel's investigation of the circumstances surrounding the shooting. Specifically, he alleges that the police instructed Steve Craig, a witness, to speak only with the police, and that the State instructed Wendy's employees not to cooperate with defense counsel.

Immediately after the incident, the police told Craig that "there was no need to talk further about this ... [u]nless it was someone from the department...." Craig subsequently refused to cooperate with Workman's counsel. Workman alleges that the police kept Craig from cooperating with his defense.

As for the employees of Wendy's, Workman offered a report of an interview of the Wendy's manager, Antoinette Law, by defense investigator Ralph Nalley. Nalley stated that during the interview, Law received a call from her boss, Spencer Russell, who told her not to give any statements to the Public Defender's Office. Later, Russell said Nalley could talk to all of the employees and they would cooperate. Workman claims that it must be inferred from this report that the State interfered with the defense's investigation by advising Russell to keep his employees from cooperating with the defense.

 "Instructions to a witness not to cooperate with the other side or to talk to lawyers for the other side would not be proper"; however, "a witness is free to talk or not unless compelled by order of the court." *United States v. Matlock,* 491 F.2d 504, 506 (6th Cir.1974). Moreover, "a defendant's right to access is tempered by a witness' equally strong right to refuse to say anything." *United States v. Scott,* 518 F.2d 261, 268 (6th Cir.1975). Thus, the prosecution's "advising a witness of 'his right not to submit to the interview [does] not deny the defendant a fair trial.'" *United States v. Medina,*

992 F.2d 573, 579 (6th Cir.1993)(quoting *Matlock,* 491 F.2d at 506).

 The State claims that Workman has procedurally defaulted this claim. It notes that Workman raised this claim for the first time at his second post conviction proceeding. The Tennessee trial court refused to reach the merits of this claim, finding that it was waived because Workman had failed to present it during an earlier proceeding. On appeal, however, the Court of Criminal Appeals discussed the merits of the claim. *Workman III,* 868 S.W.2d at 711. Therefore, Workman has exhausted this claim, and this court may also reach the merits. *See Coleman v. Thompson,* 501 U.S. 722, 735, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). ("[I][f] the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition.").

 The remarks made by the police to Steve Craig are troubling. The State claims, and the district court concluded, that the statement "there was no need to talk about this ... [u]nless it was with someone from the department ..." was merely an explanation by the officers of Craig's right not to submit to interviews. However, this conclusion omits the clear import of the statement—that Craig should only talk to the police. Thus, the police likely interfered with the defense's ability to interview Craig.

 The inquiry does not end there. In order for this interference to rise to a constitutional violation, the information possessed by Craig must have been material to Workman's defense. *See Medina,* 992 F.2d at 579 ("[W]hen claiming a denial of due process, a defendant must show more than just witness inaccessibility. The defendant must demonstrate specific prejudice from the denial of access."). As previously mentioned, Craig could only testify that Officer Parker fired his shotgun at Workman and that he did not see Davis in the Wendy's parking lot. This

evidence has little bearing upon Workman's claim of innocence.

▉▉▉ Finally, there is no evidence that the prosecution contacted Russell or any of Wendy's employees, so this claim must fail. In any event, those witnesses later cooperated. In sum, Workman has not presented sufficient proof that the prosecution unconstitutionally interfered with his defense.

### E. Aggravating Circumstances

Workman next argues that his jury included in its sentencing calculus improper aggravating factors. He makes two claims in this regard. First, he claims that his jury unconstitutionally applied two aggravating circumstances, to-wit, felony murder and escape from lawful custody. He contends that the felony murder circumstance has been held to violate the Tennessee Constitution, *see State v. Middlebrooks,* 840 S.W.2d 317, 346 (Tenn. 1992), and contends that the escape from lawful custody circumstance was not supported by sufficient evidence. Second, he argues that the jury unconstitutionally based multiple aggravating circumstances on identical facts (double counting).

As previously noted, the jury found five aggravating circumstances present. *See Workman III,* 868 S.W.2d at 708–09. Workman claims that because his jury considered two invalid aggravating factors, felony murder and escape from lawful custody, his sentence violated the Eighth Amendment and must be declared invalid. *See Espinosa v. Florida,* 505 U.S. 1079, 1081, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992); *Stringer v. Black,* 503 U.S. 222, 229–31, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992). Furthermore, he claims that "whether a convicted defendant should receive a replacement death sentence is a question that must be determined, in the first instance, by a State entity that engages in a new sentencing calculus which does not include the invalid aggravating circumstances." *Richmond v. Lewis,* 506 U.S. 40, 48–49, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992). *See Stringer,* 503 U.S. at 231–32, 112 S.Ct. 1130; *Sochor v. Florida,* 504 U.S. 527, 532, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992); *Houston v. Dutton,* 50 F.3d 381, 387 (6th Cir.1995). Therefore, he argues that his sentence should be remanded for the jury to reconsider his sentence using only the three remaining factors.

The Tennessee Supreme Court found that there was sufficient evidence that Workman killed Lt. Oliver while escaping from lawful custody.

> The defendant argues that he was never in lawful custody and could not therefore be guilty of this aggravating circumstance. On this point, the evidence shows that Lt. Oliver and the defendant came out of Wendy's together, and that the defendant did not make a break for freedom until outside the building. After that, Stoddard and Oliver had the defendant in their grasp immediately before the defendant shot and killed Lt. Oliver. Evidently, the jury found that Lt. Oliver had arrested the defendant while inside of Wendy's and had him in custody when defendant made his first break for freedom. We think this is sufficient to justify the jury finding that the defendant committed the murder "during his escape from lawful custody."

*Workman I,* 667 S.W.2d at 49.

Workman contends that the facts as found by the Tennessee Supreme Court are inaccurate and therefore do not support its conclusion. He argues that Lt. Oliver never went inside Wendy's, but met Workman outside the doors. Accordingly, Workman was never in "custody."

The district court correctly determined that the Tennessee Supreme Court's factual findings in this regard were not supported by the record. In fact, Lt. Oliver did not enter Wendy's but rather encountered Workman outside the restaurant. Officer Stoddard testified that

> [a]s they got outside the door the male white broke and started to run, and Lt. Oliver hollered hold it. He reached out and grabbed around him like that, and they fell out in the parking lot. The guy fell, Lt. Oliver didn't go all the way down ... by the time they managed to get up, I had run over there and they both were standing back up. I also got hold of him and we started struggling. The man was

trying to run and we were trying to keep him from running.

Furthermore, Davis testified that he "saw a white male coming out of the door and a policeman was getting ready to go in. I heard the policeman tell him to hold it, and they started struggling."

■ Whether Workman was arrested in Wendy's or immediately outside does not affect the fact that he was placed in custody, however temporarily, by Lt. Oliver and Officer Stoddard. This testimony supports the jury's finding that Workman was in lawful custody and subsequently escaped. Although the Tennessee Supreme Court misstated the facts, this error is of minimal consequence. Furthermore, the court implicitly defined custody as encompassing the situation that occurred here. *See Workman I*, 667 S.W.2d at 49.[1]

■ We agree with Workman that the jury improperly considered the felony murder aggravating; nevertheless, we think it rightfully considered the remaining four factors. Therefore, this court must determine whether the error was harmless. The correct standard for harmlessness on habeas review is whether the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). In *Workman III*, the Tennessee Court of Criminal Appeals eliminated the felony murder factor, but found that "there were four aggravating circumstances in addition to the underlying felony used to establish the felony murder conviction" and deemed the error harmless. *Workman III*. 868 S.W.2d at 713.

The district court also performed a detailed analysis of this error.

First, absolutely no additional evidence was submitted as a result of the invalid aggravating circumstance. Thus, the jury did not improperly consider any evidence in making its findings. Second, the jury found four other aggravating circumstances. One of these was the fact that petitioner murdered a police officer acting in the line of duty. Another was that defendant knowingly created a great risk of death to two or more persons, other than the murder victim. Third, petitioner presented no evidence of any mitigating circumstances at the sentencing phase. The only evidence in the entire record that could possibly support a finding of any mitigating circumstance is petitioner's testimony at the guilt phase of the proceeding that he was a drug user and under the influence of drugs at the time of the offense, the fact that no evidence suggests that the murder was planned before petitioner's encounter with Oliver, and petitioner's testimony that he shot after pulling his own gun out to give to the officers. Fourth, defendant did not challenge the evidence as to any of the aggravating circumstances submitted to the jury; there was no fact issue before the jury concerning any of these.

Clearly, the jury's consideration of the felony murder circumstance did not substantially influence the decision.

■ Assuming, *arguendo*, that escape from lawful custody could not properly be considered an aggravating circumstance here, and given that the use made of the felony murder factor was an error, although harmless, there were still three additional aggravating factors as to which the jury's findings are unassailable. Workman suggests that this court cannot perform a harmless error analysis (which he describes as a

1. Workman presents another novel argument. He claims that, assuming this court determines there was sufficient evidence to support a finding of escape from lawful custody, he cannot be liable for felony murder of Lt. Oliver, because the underlying robbery would have been over when Lt. Oliver was shot. Therefore, he was only guilty of killing Lt. Oliver during an escape, which is not a statutory predicate for felony murder. *See* Tenn.Code Ann. 39–2–202(a)(repealed). The State contends that this argument is meritless because, under Tennessee law, flight from the robbery scene is part of the robbery, and not collateral to it, for purposes of felony murder. *See State v. Hopper*, 695 S.W.2d 530–36 (Tenn.Crim.App.1985). However, *Hopper* does not address the precise question raised here— whether the robbery was indeed over when Workman was reduced to custody. In any event, this argument has never before been presented and therefore is defaulted.

"new" sentencing calculation) and apply the three remaining factors because no Tennessee court has had the opportunity to do so. *See Richmond v. Lewis*, 506 U.S. 40, 49, 52, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992). He concedes that the Tennessee courts have addressed the issue of the improper consideration of certain aggravating factors, but have performed the harmless error analysis only by eliminating one factor, not two. *See Workman I*, 667 S.W.2d at 49 (escape from lawful custody); *Workman III*, 868 S.W.2d at 713 (felony murder). Moreover, Workman argues that under Tennessee law, only a jury can sentence him to death, and therefore his sentence should be remanded to his original jury in order to determine whether the three remaining aggravating circumstances could support the death sentence. *See* Tenn.Code Ann. § 39-2-203(a)(1982)("[T]he jury shall fix the punishment in a separate sentencing.").

Notwithstanding Workman's arguments, this court may perform a harmless error analysis using the three remaining factors. *See Brecht*, 507 U.S. at 637–38, 113 S.Ct. 1710. For the reasons stated above, Workman's sentence could be sustained utilizing the three aggravating circumstances.

Workman next claims that two aggravating circumstances found by the jury, namely, escape from lawful custody and interference with lawful arrest, were duplicative, i.e., based upon the same facts, so the jury violated the Eighth and Fourteenth Amendments in rendering its verdict.

The State argues that Workman defaulted this argument because the first time he raised it was in his final application for appeal to the Tennessee Supreme Court, which was his eighth state appeal, petition, or application for appeal. The Tennessee Supreme Court denied Workman's application. Therefore, according to the State, Workman has failed to exhaust this claim because there has been no "fair" presentation of this issue to the Tennessee courts. *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)(To comply with the exhaustion requirement, petitioner's claim must be "fairly presented to the state courts."). Because Workman has no state remedy available now,

the State contends that he has defaulted this claim. *See Teague v. Lane*, 489 U.S. 288, 297–99, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Workman attempts to overcome this default in two ways. First, he argues that the claim was exhausted because the Tennessee Supreme Court was required to review the record to "determine whether the sentencing of death was imposed in any arbitrary fashion," Tenn.Code Ann. § 39-2-205(c)(1), and that a sentence of death based on duplicative aggravating factors is arbitrary, *see State v. Carter*, 714 S.W.2d 241, 250–51 (Tenn.1986). Workman concludes that because the Tennessee Supreme Court found that his sentence was not arbitrary, it must have reviewed this claim, and it is therefore available for federal review.

The district court did not find this argument persuasive, concluding that the Tennessee Supreme Court was not required to review this aspect of the case because the jury did not act arbitrarily. Workman claims the district court erred because it relied upon a dictionary definition of "arbitrary" and that the term is actually a term of art that dates back to *Furman v. Georgia*, 408 U.S. 238, 310, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)(Stewart, J., concurring).

Workman's arguments fail. *Carter* does not stand for the proposition that multiple aggravating circumstances based on identical conduct renders a death sentence arbitrary in Tennessee. Therefore, it is far from certain that the Tennessee Supreme Court's statutory duty to review the sentence for arbitrariness would include the type of analysis suggested by Workman. Thus, the Tennessee courts have not had the opportunity to review this claim, and likely would not do so now. *See* Tenn.Code Ann. § 40-30-112(b); *Workman III*, 868 S.W.2d at 705 (discussing waiver in Tennessee). Therefore, this claim has not been properly preserved and is defaulted. *See Coleman*, 501 U.S. at 735, n. 1, 111 S.Ct. 2546.

Workman's second argument is that his appellate counsel's ineffectiveness constitutes cause and that he was prejudiced by the error. As previously mentioned, Workman's appellate counsel was not ineffective; therefore, Workman has not demonstrated suffi-

cient cause for failure to raise this issue. *See Rust*, 17 F.3d at 160. This issue is likely defaulted, but the merits will nonetheless be addressed.

 This court's review of a state court's evidentiary finding under state law is severely limited.

Where the issue is solely whether a state court has properly found the existence of a constitutionally narrowed aggravating circumstance ... a federal court must determine ... whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the [aggravating circumstance] beyond a reasonable doubt.

*Lewis v. Jeffers*, 497 U.S. 764, 781–82, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990)(emphasis in original). However, this court need not accept a state factual finding where that finding is not "fairly supported by the record." 28 U.S.C. § 2254(d)(8). *See Hart v. Marion Correctional Institution*, 927 F.2d 256, 259 (6th Cir.1991).

 Tennessee's scheme narrows the class of death-eligible murderers prior to sentencing. At the time of Workman's offense the only offense for which the death penalty could be imposed was murder in the first degree, which was defined as:

Every murder perpetrated by means of poisoning, lying in wait, or by any other kind of willful, deliberate, malicious, and premeditated killing, or committed in the perpetration of, or attempt to perpetrate, any murder in the first degree, arson rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful throwing, placing, or discharging of a destructive device or bomb

. . . . .

Tenn.Code Ann. § 39–2–202(a)(1982).

A jury could sentence an individual to death only upon finding the presence of one or more statutory aggravating circumstances. Tenn.Code Ann. § 39–2–203(i). Therefore, despite Workman's arguments, this statutory scheme requires the jury to perform the narrowing function required by the Eighth Amendment.

## F. Instructions

Workman takes issue with two instructions given by the trial court. First, he contends that the instruction relating to reasonable doubt violated the Fourteenth Amendment. Second, he claims that the instruction concerning malice was in error.

 At the close of the guilt phase, the court instructed the jury that

Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of guilt. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the offense.

The court also gave a similar instruction at sentencing. Workman claims that these instructions violate the constitution because they "failed to adequately convey the high level of probability required for Workman's conviction and death sentence."

 In *Victor v. Nebraska*, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), the Court held that the use of the term "moral certainty" does not, in itself, render a reasonable doubt instruction unconstitutional. The phrase "moral certainty" is constitutional where the rest of the instruction "lends content to the phrase," and indicates the proper burden of proof. *Id.* at 14, 114 S.Ct. 1239.

In *Austin v. Bell*, 126 F.3d 843 (6th Cir. 1997), this court considered instructions almost identical to those given in the present case and held:

We find the reasonable doubt instruction in this case is more like the acceptable language in Victor than the unacceptable language in Cage. The language of an "inability to let the mind rest easily" lends content to the phrase "moral certainty" similar to the "abiding conviction" language in Victor, increasing, if anything, the prosecutor's burden of proof. It also does

not create a reasonable likelihood that the jury applied the instruction in a way that would lower the state's burden of proof because it does not increase the measure of doubt beyond a "reasonable doubt."

*Id.* at 847. This controls the conclusion here.

As to Workman's argument concerning the malice instruction, he begins with a discussion of the required elements of proof for felony murder. He notes that at the time of the offense and his trial, "murder" was defined in Tennessee as follows: "If any person of sound memory and discretion, unlawfully kills any reasonable creature in being, and under the peace of the state, with malice aforethought, either express or implied, such person shall be guilty of murder." Tenn. Code Ann. § 39–2–201(1982). Furthermore, the statute under which he was convicted read: "Every murder ... committed in the perpetration of, or attempt to perpetrate, ... robbery ... is murder in the first degree." Tenn.Code Ann. § 39–2–202 (1982).

■ Workman claims that by statutory definition, he could not have been guilty of first-degree felony murder unless the jury found that he committed "murder" during the course of a robbery. Therefore, according to Workman, the prosecution was required to prove three elements: (1) that he unlawfully killed; (2) with malice aforethought; (3) in the perpetration of, or attempt to perpetrate, a robbery. Instead, the jury was instructed to find Workman guilty of first degree murder if it found that: (1) he unlawfully killed Ronald Oliver; (2) during the perpetration of, or attempt to perpetrate, an alleged robbery; and (3) he specifically intended to commit the alleged robbery. Workman claims that the omission of the "required" element of malice was in error.

Although an interesting argument, this claim regarding malice as an element of felony murder is meritless. In *Middlebrooks,* 840 S.W.2d at 335–341, the Tennessee Supreme Court reaffirmed previous holdings that to support a felony murder conviction, "the prosecution is not required to prove the elements of malice, deliberation and premeditation, or that the defendant intended to kill the victim. Instead, where the offense is committed in the perpetration of a designat-

ed felony, the elements of malice, deliberation and premeditation are implied." (Citations omitted.). *See also State v. Johnson,* 661 S.W.2d 854, 861 (Tenn.1983); *State v. Hopper,* 695 S.W.2d 530, 535 (Tenn.Crim. App.1985); *Tosh v. State,* 527 S.W.2d 146, 147–48 (Tenn.Crim.App.1975).

■ The trial court also gave instructions on first-degree premeditated and deliberate murder (count two). The jury was instructed that in order to find Workman guilty of premeditated and deliberate murder, the state must prove that he killed the victim, and that the killing was malicious, willful, deliberate, and premeditated. The instructions further explained that the killing "is presumed to be malicious in the absence of evidence which would rebut the presumption;" that "[a]ll homicides are presumed to be malicious" in the absence of such evidence; and that "if a deadly weapon is handled in a manner so as to make the killing a natural and probable result of such conduct, then there is a raised presumption of malice sufficient to support a conviction of murder in the second degree...." Workman claims that this burden-shifting instruction was in error.

The State concedes that these instructions were unconstitutional according to *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). However, because the jury did not convict Workman of premeditated and deliberate murder, but rather of felony murder, this erroneous instruction was clearly harmless. *See Davis v. Tennessee,* 856 F.2d 35, 36 (6th Cir. 1988)("We hold that such an instruction is superfluous, and therefore harmless error, in a clear case of felony murder. In such cases, the petitioner's participation in the felony during which the murder is committed ... is a substitute for the elements of intent to kill and malice which otherwise must normally be proved in a murder case."). *See also Houston v. Dutton,* 50 F.3d 381, 386 (6th Cir. 1995).

### G. Remaining Claims

Workman has presented a litany of further claims with very little accompanying discus-

sion. These include: (1) the prosecution's unconstitutional seeking of the death penalty based on the desires of Lt. Oliver's family; (2) the death penalty being disproportionately applied in his case; (3) the prosecution's use of Lt. Oliver's picture during closing statements; (4) pretrial publicity; (5) the prosecution's alleged solicitation of a promise from the jury to impose the death penalty; (6) the trial court's failure to excuse a particular juror; (7) errors in sentencing instructions; (8) the prosecution's elicitation of certain unspecified testimony during sentencing; (9) the unconstitutionality of the death penalty; (10) the unconstitutionality of death by electrocution; and (11) the cumulative effect of the aforementioned errors. After review of his arguments and the relevant law, we find no merit as to any of his remaining claims.

**AFFIRMED.**