RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0296P (6th Cir.)
File Name: 00a0296p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

PHILIP R. WORKMAN,
    *Petitioner-Appellant,*

    *v.*

RICKY BELL, Warden,
    *Respondent-Appellee.*

Nos. 96-6652;
00-5367

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 94-02577—Julia S. Gibbons, Chief District Judge.

Argued: May 30, 2000

Decided and Filed: September 5, 2000

Before: MARTIN, Chief Judge; MERRITT, NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY, and GILMAN, Circuit Judges.

---

### COUNSEL

**ARGUED:** Christopher M. Minton, OFFICE OF THE POST-CONVICTION DEFENDER, Nashville, Tennessee, for Appellant. Joseph F. Whalen III, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Christopher M. Minton, OFFICE OF THE POST-CONVICTION DEFENDER, Nashville,

1

Tennessee, Saul C. Belz, WARING COX, Memphis, Tennessee, for Appellant. Joseph F. Whalen III, Gordon W. Smith, Michael E. Moore, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

———————————

**ORDER**

———————————

The October 30, 1998, panel decision, as amended, affirming the District Court's denial of the petition for habeas corpus remains in effect. As a result of an equally divided Court, the *en banc* Court rejects the petitioner's motion to reopen. Seven judges have voted to reverse and remand the case for further proceedings for the reasons stated in an opinion written by Judge Merritt and attached hereto. Seven judges have voted against a remand for further proceedings in the District Court.

Accordingly, the stay of execution heretofore entered is dissolved.

ENTERED BY ORDER OF THE COURT


/s/ Leonard Green

———————————————————————

    Clerk

There was no person other than Workman, Oliver, Stoddard and Parker, at the scene with a firearm. Although petitioner asserts that the shot that hit Oliver must have come from Parker or Stoddard, there is no support in the record for that conclusion.

For all these reasons, I would deny the petition for rehearing en banc and affirm the decision of the prior panel of this court and the district court in denying the writ.

Although Workman asserts that Davis was the only eyewitness to the shooting, it is not as if this shooting occurred in a vacuum. Officer Stoddard was beside Oliver when he was shot and Officer Parker shortly thereafter came upon the scene. In addition, numerous witnesses around the restaurant testified that they had seen Workman there. Moreover, it is not a case of mistaken identity, because Workman testified during the trial that he pulled the trigger, the gun fired, and he emptied his gun toward the officers. In post-conviction proceedings, he said he confessed he fired the fatal shot that took Oliver's life. Even Davis in his latest statement asserts that Workman was on the scene, struggling with one or more officers.

Stoddard was shot by Workman and did not fire his weapon. That was further corroborated by the police report which indicated that after the shooting, another officer took custody of Stoddard's weapon and found it to be loaded with six live rounds. Unless he reloaded after having been wounded, there is no likelihood that he fired his handgun. Parker also denied firing any weapon, although a police document indicates that Parker had a shotgun and Steve Craig said that after Oliver was shot, Parker shot at Workman with the shotgun. That evidence was resolved in the prior decision of this court when we said there, "Even Dr. Sperry does not theorize that Lt. Oliver was killed with buckshot." *Workman*, 178 F.3d at 768.

The other opinion says:

> Without Davis's testimony, the only witness who would have testified that he saw Oliver fall and simultaneously saw Workman with a gun in his hand was Officer Parker, whose testimony is made less credible due to the fact that he himself could possibly have fired the shot that killed Oliver, albeit unintentionally.

However, there is no testimony in the record, nor has the petitioner produced any during the almost 19 years since the events occurred, that any other person there besides Workman and Oliver fired a handgun.

---

**OPINION**

---

MERRITT, Circuit Judge, joined by MARTIN, Chief Judge, and MOORE, DAUGHTREY, COLE, CLAY, and GILMAN, Circuit Judges. In this death penalty, habeas corpus case in which we have temporarily stayed Philip Workman's execution in Tennessee, Workman claims that two items of newly discovered evidence, discussed below, show that he did not kill Lt. Oliver of the Memphis Police Department during a robbery in 1981--the crime for which he was sentenced to death.[1] Workman asks this court to recall

---

[1] Workman was technically convicted of first-degree murder under Tennessee Code § 39-2-202(a) (1982), specifically "murder in the perpetration of a robbery." At that time, first-degree premeditated murder and first-degree felony murder were both defined by this same subsection of the Tennessee Code. It is important to note, however, that the theory which the prosecution used to try this case focused on the fact that the prosecution believed that Workman's bullet actually killed Lt. Oliver, not that Lt. Oliver died during the course of a robbery which Workman facilitated. In fact, the jury instructions specifically stated that in order for the jury to convict Workman of "murder during the perpetration of a robbery," or first-degree felony murder, the jury must conclude that Workman actually killed Oliver during the commission of a felony. *See* Joint Appendix at 79. It is unclear whether or not the trial court's conclusion that Mr. Workman must have committed the murder himself in order to be liable for felony-murder was in error in this case. While Tennessee has clearly established that deaths caused by a defendant's other accomplices may be attributed to the defendant under the felony-murder statute, it appears that Tennessee has never spoken on the subject of whether a death caused by someone unaffiliated with the perpetrator of the underlying felony will support a conviction for first-degree felony murder. The leading case on the topic, still quoted today, did *not* determine that a felony-murder prosecution arose from any death caused by the commission of a felony, but rather stated:

> It must be a killing in the pursuit of an unlawful act that all were engaged in; and in carrying out the original design, if any one of the party kill any one that oppose them, it would be murder in all the rest of the company that come with the intent to do that unlawful act, though there was no express intention to kill any person in the first enterprise; because, the law presumes they

the mandate which issued in this case in May 1999, following the decision of a panel of this court affirming the district court's grant of summary judgment in favor of the state of Tennessee regarding Workman's petition for a writ of habeas corpus.[2]    The line of cases that ended with this court's

come to make good their designs against all opposition. *Moody v. State*, 46 Tenn. 299 (S.Ct. 1869). It seems, then, that Tennessee courts require that in order for a defendant to be convicted of felony murder for a murder which he did not himself commit, the person who committed the murder must have had at least the intent required of the defendant, which is the intent to commit the underlying felony. This would not be an unreasonable rule.

We do not believe that the decision of a jury which was instructed to determine that Workman actually caused the death of Lt. Oliver by his own hand can be salvaged under these circumstances if Workman is able to show that withheld evidence could have convinced a jury that Oliver was killed by "friendly fire." Alternatively, it is obvious that if the jury had harbored doubts about whether Workman's bullet killed Lt. Oliver, then that jury would have had a considerably more difficult time sentencing Workman to death, and perhaps would not have done so. Therefore, we conclude that it is our duty at this stage of the proceedings to determine whether or not Workman has alleged evidence which would tend to show that his bullet did not kill Lt. Oliver, and that such evidence, if the standards outlined in the rest of this opinion are met, would suffice to justify at the least a new sentencing hearing if not a new trial in this case.

[2] For the complete factual and procedural history of the state court proceedings, see *State v. Workman*, 667 S.W.2d 44, 46-47 (Tenn.), *cert. denied, Workman v. Tennessee,* 469 U.S. 873 (1984)("Workman I"); *Workman v. State*, C.C.A. No. 111, 1987 WL 6724 (Tenn. Crim. App., February 18, 1987), *cert. denied, Workman v. Tennessee*, 484 U.S. 873 (1987)("Workman II"); and *Workman v. Tennessee,* 868 S.W.2d 705, 707-08 (Tenn.), *cert. denied, Workman v. Tennessee*, 510 U.S. 1171 (1994)("Workman III"). After exhausting his available state court procedures, Workman filed a petition for a writ of habeas corpus in the United States District Court for the Western District of Tennessee on July 18, 1994. On cross-motions for summary judgment, the district court entered summary judgment against Workman in October 1996. He appealed that decision to this court, and a three-judge panel denied his appeal on October 30, 1998. No petition for rehearing was granted, and our mandate issued in May 1999. After discovering new evidence in October 1999 and again in February 2000, Workman requested that this court reconsider its previous decision.

alleged perjury by Davis at the original trial, but it also favors a remand on the grounds of newly-discovered evidence under the theory that pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), the prosecution at the trial failed to provide the X-ray and used the allegedly perjured testimony of Davis. The petitioner did not cite *Brady* in his supplemental en banc brief. Probably he realized such an issue was precluded by § 2244.

Although the other opinion states in footnote 4, "[W]e are not reviewing an application for permission to file a second petition or a panel's decision to permit or deny such a request," that is exactly what it is doing. The criteria for reviewing the claim under newly-discovered evidence is set out in 28 U.S.C. § 2244(b)(2)(B). This is a second or successive petition that has already been denied by the original panel. The other opinion suggests that to do otherwise "would raise serious constitutional issues under the due process clause and under Article I, § 9, which prohibits the suspension of the writ of habeas corpus." However, Congress restricted the writ of habeas corpus in several aspects when it passed AEDPA, including a one-year period of limitation within which to file the petition in § 2244(b). Thus, if a prisoner purposefully or by inadvertence lets the time run under which he could have filed his petition, he cannot file a petition beyond the statutory time, even if he claims "actual innocence." The same principle applies to the filing of a second or successive petition. Congress has limited the appeal through one panel of the court. The writ of habeas corpus has not been suspended; it has just been restricted.

The other opinion also suggests that the district court should have an evidentiary hearing on the issue of whether a reasonable jury would have come to a different conclusion if it had this evidence before it. This also is a claim under 28 U.S.C. § 2244(b)(2)(B). Again, that is the subject of a second or successive petition, so it cannot be considered en banc. Nevertheless, the evidence at the trial should be recited to show the significant proof against Workman.

restaurant when Workman was confronted by the officers, although he said he didn't see any shots fired. He now says he was in his car, but he was not able to determine who shot Oliver, although he recalls seeing Workman and a number of officers struggling before one officer fell back and pulled his gun.

### FRAUD ON THE COURT

I agree that this en banc court can consider the petition under the theory of a "fraud upon the court," as explained in *Demjanjuk v. Petrovsky*, 10 F.3d 338, 352 (6th Cir. 1993). *See Calderon*, 523 U.S. at 557. One of the elements of fraud upon the court is that the conduct must be by an officer of the court. If there was fraud on the court for failure to produce the X-ray before the district court, the act was not by an officer of the court, but by the Shelby County Medical Examiner. In addition, the X-ray was not material to the issues, as shown by the first affidavit by Dr. Sperry. Fraud upon the court primarily turns upon whether it was perpetrated by an attorney, *Demjanjuk, 10 F.3d* at 352, and nothing in this record demonstrates the Attorney General knew of the X-ray at the district court proceeding.

If there was any fraud on the court with regard to the testimony of Davis, that would have been a fraud upon the state court, and should be presented to that court, not to our court. At argument, counsel for the petitioner admitted that if there was a fraud involving the testimony of Davis, it would have been a fraud on the state court only. However, he emphasized that it should be considered as corroboration of fraud upon the federal court by the failure to produce the X-ray. Nevertheless, there is no fraud upon our court under the criteria set out in *Demjanjuk* which would authorize this extraordinary relief requested.

### NEWLY-DISCOVERED EVIDENCE

The other opinion favors a remand not only to decide the issue of fraud upon the court based upon the failure to produce the X-ray at the habeas corpus hearing and the use of

mandate dealt solely with Workman's first petition for habeas corpus. After Workman discovered new evidence, in October 1999 and again in February 2000, he made several requests of this court. The one we undertake to review today is Workman's request to reopen the line of cases concerning his first petition for habeas corpus and reconsider the opinion previously issued by our panel concerning the denial of that petition.

### I. Appellate Jurisdiction

Before we address the substance of Workman's request to recall our mandate, we must address a previously-issued en banc decision of this Court on a matter of procedure, *In re King,* 190 F.3d 479 (6th Cir. 1999), *cert. denied,* 120 S.Ct. 1538 (2000). In that case, we unanimously held that "once a panel of this court grants or denies an individual permission to file a second or successive petition in the district court, § 2244(b)(3)(E) prohibits any party from seeking further review of the panel's decision, either from the original panel or from the en banc court." *Id.* at 480. That decision is not applicable to the situation at hand. Workman did in fact request permission to file a second petition on March 24, 2000, which was denied by an order of March 31, 2000. We have not undertaken to review that decision in this en banc consideration of Workman's request to recall our mandate issued on Workman's first habeas petition. Such a request is different from an application for a second petition, as the Supreme Court made quite clear recently in *Calderon v. Thompson*, 523 U.S. 538 (1998), discussed below.

### II. Recall of Mandate Based on Fraud on the Court

Next, we must address the substance of Workman's request that we recall our mandate and reconsider our decision denying his first petition for a writ of habeas corpus. The recent Supreme Court case *Calderon v. Thompson*, 523 U.S. 538 (1998), must necessarily control the case before us. In *Calderon v. Thompson*, the Supreme Court reviewed a decision of the Ninth Circuit, sitting *en banc*, which recalled the court's mandate, reopened a case, and subsequently

granted a petitioner's previously-denied request for a writ of habeas corpus. According to *Calderon v. Thompson*, the Courts of Appeals are recognized to have an inherent power to recall their mandates, subject to review for abuse of discretion. *See id.* at 549 (citing *Hawaii Housing Authority v. Midkiff*, 463 U.S. 1323, 1324 (1983)); *see also BellSouth Corp. v. Federal Communications Comm.*, 96 F.3d 849, 851 (6th Cir. 1996). One of the reasons which would justify recalling a mandate is the potential existence of a fraud upon the court.[3] *See id.* at 557.

Before we reach the issue of abuse of discretion, however, we must examine whether or not the *Calderon v. Thompson* Court intended that a recall of a mandate based upon a potential fraud on the court below should be subject to the "second or successive petition" requirements of the Antiterrorism and Effective Death Penalty Act of 1996, found at 28 U.S.C. § 2244. As a general rule, when a mandate is recalled with respect to a petition for a writ of habeas corpus, the petitioner first must satisfy the requirements for the filing of a second or successive petition as outlined in § 2244(b). *See Calderon v. Thompson*, 523 U.S. at 553. As the Court noted, if this were not the requirement, "petitioners could evade the bar against relitigation of claims presented in a prior application . . . or the bar against litigation of claims not presented in a prior application . . . ." *Id.*

While the Court's conclusions with respect to the applicability of section 2244 to recalls of mandates was in fact dicta and not the holding of the case, it nevertheless received

---

[3]We note that a suspicion of fraud upon the court is not the only reason that a court of appeals may find it necessary to recall a mandate, but merely one of the reasons outlined in the *Calderon v. Thompson* opinion. The Court stated that a mandate may be recalled when it is necessary to address new circumstances before the court which are "grave" and "unforeseen" or which are, in other words, unforeseeable circumstances which implicate the justice of the judgment previously rendered. *Calderon v. Thompson*, 523 U.S. 538, 549 (1998).

suggested that "we have no doubt that the exit wound would have been larger than the entry wound," *id.* at 768, because it was not based upon evidence in the habeas corpus record. We failed to include in that opinion the fact that the exit wound was in an irregular shape, but which at its widest was .64 inches. Although Dr. Sperry testified that the exit wound was smaller than the entrance wound, it is clear that .64 inches is wider than .50 inches, even if it is only .21 inches long. If there is any talking out of both sides of the mouth, it would probably be from Dr. Sperry, for he testified in the clemency proceeding before Tennessee Governor Don Sundquist that, "If I was asked the question, do I have an opinion as to what bullet it was, I could not tell you because I could not meet that level of certainty. However, I think it more probable than not that it was the .38 and not the .45." That appears to contradict his affidavit before this court in which he claims that, "To a reasonable degree of medical certainty 'the bullet was not a .45 caliber silver-tip hollow-point bullet.'" There is nothing new in his conclusions that was not considered previously by the district court and our original panel.

### *TESTIMONY OF HAROLD DAVIS*

The petitioner now asserts that the prosecution used perjured testimony at the time of the original trial. This issue was previously raised in his first petition. *See id.* at 766. Obviously, he did not have the recanted testimony when the first petition was filed, because he was unable to convince the court that the testimony of Davis was false, except to show that no one had seen him at the scene of the crime. However, Davis now admits he was at the scene. Before the first habeas petition was filed, Workman's counsel had already made contact with Davis, who had denied that his testimony was coerced or false. In addition, it is noteworthy that the recantation statement filed in this court is not under oath, unlike his testimony at trial, and is in contradiction to the other statement filed by Vivian Porter that Davis was with her the night Oliver was shot, at an entirely different location. His recanted statement admits that he was at the Wendy's

Before Dr. Sperry ever saw the X-ray, he concluded in his affidavit in 1995 that the bullet that went through Oliver "created an exit wound smaller than the entry wound." That is erroneous, because he based it upon the autopsy report, which clearly shows that the exit wound is in a jagged form measuring .64" x .21", which is somewhat larger and much more distorted than the entry wound, which is .50" in diameter. Therefore, as Dr. Sperry was able to reach his conclusions long before he ever saw the X-ray, the X-ray does nothing more than corroborate the fact that the bullet exited the body intact.

The other opinion suggests:

Not only did the panel [of this court] ask about the existence of an x-ray at oral argument, but it specifically commented that the lack of an x-ray influenced its decision in its written disposition.

It suggests later:

The panel of our court that originally heard this appeal did not know of the existence of an x-ray showing Oliver's wounds. It speculated that in the absence of an x-ray which would disprove the theory that only a fragment of the .45-caliber bullet exited Oliver's body, thus creating the smaller exit wound, there was no reason to conclude that Workman's bullet didnot actually cause Oliver's mortal wound.

Admittedly, the original panel of this court did not know of any X-ray evidence, and such a statement was speculation. However, the lack of X-ray evidence was not mentioned in the opinion and the lack of the X-ray had no bearing on the ultimate conclusion by the panel. The other opinion erroneously cites the original decision, *Workman v. Bell*, 160 F.3d 276 (6th Cir. 1998), which was superseded, upon a petition for rehearing, by the decision which is now before the court, *Workman v. Bell*, 178 F.3d 759 (6th Cir. 1998). Our court did not "talk out of the other side of our mouths," as suggested by the other opinion. It was dictum when the court

the approval of a unanimous Court. This rule is not without exceptions, however. The Court clearly stated:

We should be clear about the circumstances we address in this case. We deal not with the recall of a mandate to correct mere clerical errors in the judgment itself, similar to those described in Federal Rule of Criminal Procedure 36 or Federal Rule of Civil Procedure 60(a). The State can have little interest, based on reliance or other grounds, in preserving a mandate not in accordance with the actual decision rendered by the court. *This also is not a case of fraud upon the court, calling into question the very legitimacy of the judgment.* Nor is this a case where the mandate is stayed under Federal Rule of Appellate Procedure 41 pending the court's disposition of a suggestion for rehearing en banc.

*Id.* at 557 (citation omitted)(emphasis added). Thus, cases of fraud upon the court are excepted from the requirements of section 2244. The rationales that lie behind such an exception are persuasive. First, the requirements of section 2244 place the burden on the petitioner to prove that the outcome of his case would have been different in the face of new evidence, forcing him to prove that his first trial was fundamentally unfair. In most cases, this burden lies with the prisoner because it would have been his duty to search for and argue the evidence in his favor at the time of trial. Prisoners bear that duty in order to avoid subjecting the courts to repeated relitigation due to the submission of evidence which could have been discovered earlier. That is not the situation before us. In a case of fraud upon the court, as noted above, the legitimacy of the judgment is called into question because of the intentional wrongdoing of the prosecution, not the inaction or inefficiency of the defense. Where a prisoner can show that the state purposefully withheld exculpatory evidence, that prisoner should not be forced to bear the burden of section 2244, which is meant to protect against the prisoner himself withholding such information or intentionally prolonging the litigation.

Second, the Court noted that a fraud upon the court calls into question the very legitimacy of a judgment. That characterization of the situation which arises when the prosecution fails to reveal exculpatory evidence to the defense would seem to satisfy, at least in spirit, the requirement of section 2244. The difference between questions of fraud upon the court and ordinary newly-discovered evidence situations is that an allegation of fraud casts a dark shadow over the prosecution's intentions. The situation suggests that a judgment may have been reached with the assistance of a prosecutor who may not have had the intention of finding the true perpetrator. Such a judgment is inherently unreliable, and therefore satisfies the requirements of section 2244 in spirit.

Our task, then, is to determine whether Workman has alleged sufficient facts to support an evidentiary hearing before the district court to determine whether there was a fraud on the court below. First, Workman maintains that police coerced alleged eyewitness Davis into expanding the scope and detail of his testimony outside of what he actually witnessed at the time of Lt. Oliver's death. According to Davis's trial testimony, he actually witnessed Lt. Oliver being shot by Workman during the altercation outside of the Wendy's restaurant, and he viewed the entire altercation from outside of his vehicle. In addition, the sequence of events to which Davis testified made it impossible for anyone other than Workman to have shot Lt. Oliver. His testimony placed Officer Stoddard on the ground with a gunshot wound to his right arm and additionally placed Officer Parker en route to the scene from the other side of the building at the time of the injury which resulted in Oliver's death. According to Davis's recantation, which was obtained for the first time in October 1999, Davis was actually hiding in his car, unable to see either the sequence of events or to determine who actually shot Oliver, although he did recall seeing through his rear-view mirror Workman and an unidentified number of officers struggling whereafter one officer fell back and pulled his gun. At that time, Davis left the scene. Davis now asserts that he did not leave his vehicle at any time and that he did not see

The autopsy report and photography establish that a projectile created a wound track across the victim's chest. The projectile that caused this wound track did not fragment inside the victim's body. It traversed the victim's chest and emerged from his body intact.

It is significant that he struck out the statement obviously furnished by petitioner's counsel that suggested the conclusion came from X-ray evidence. This affidavit is consistent with an affidavit dated September 12, 1995, which was presented to the district court hearing the habeas corpus petition when Dr. Sperry stated therein that "Exhibits C and D [autopsy protocol and picture] indicate that the bullet that created the illustrated bullet wounds exited the decedent's body, and in doing so, created an exit wound smaller than the entry wound." Moreover, the autopsy report did not reveal the existence of any bullet fragments in Oliver's body. Thus, the X-ray has proven nothing that the original autopsy and photographs failed to show. The X-ray does not show wounds, but only shows that the bullet did not fragment in Oliver's body.

Dr. Sperry filed another affidavit on April 1, 2000, in which he amplified upon his previous affidavit by saying:

That x-ray establishes that the bullet that killed the victim did not fragment inside the victim's body. That x-ray establishes that the bullet that killed the victim emerged from his body intact. Because the x-ray establishes that the bullet that killed the victim did not fragment, and because the x-ray establishes that the bullet that killed the victim emerged from his body intact, I believe to a reasonable degree of medical certainty that the bullet that killed the victim was not a .45 silver-tip hollow-point bullet.

Although he added language to his previous affidavit, he came to the same earlier conclusion prior to looking at the additional X-ray evidence.

equivalent motion in the court of appeals - which is to say, a motion to recall the mandate - is a "second or successive" application for purposes of § 2244(b).

*Burris v. Parke*, 130 F.3d 782, 783 (7th Cir. 1997), citing *In re Sapp*, 118 F.3d 460 (6th Cir. 1997). Admittedly, the decision in *Calderon*, 523 U.S. at 557, left open the question of whether a petitioner may raise the very limited issue of a fraud upon the court. The other opinion says that there is a difference between fraud upon the court and newly-discovered evidence, but the alleged fraud upon the court here is based upon newly-discovered evidence, that is, the discovery of the X-ray of the victim's body and a recanted statement by an eyewitness, Harold Davis. The evidence may be considered newly discovered to Workman, but for reasons stated hereinafter, I suggest that the X-ray adds nothing to the evidence in this case. Therefore, it is not material and the alleged perjured testimony by Davis has already been the subject of a ruling in the first petition.

### X-RAY EVIDENCE

The X-ray of Lt. Oliver was subpoenaed, not at the trial, but only for the district court habeas corpus proceeding. It was also subpoenaed from the Shelby County Medical Examiner, not requested of the prosecution. It was not produced, probably by inadvertance. For purposes of this decision, however, we must assume it was withheld intentionally. The attorney for the State did not have the X-ray at the trial, so far as the record shows. It was in the custody of the Shelby County Medical Examiner. What does it show? It shows that the bullet which killed Oliver likely went through the body intact. Without other evidence, one cannot even know the locations of the entry hole and the exit wound. By other evidence, however, both sides agree that the entry hole was on the left chest and the exit was on the right back.

But the trial court and the habeas corpus court already knew that from the evidence. Even Dr. Sperry's original affidavit executed on March 4, 2000, stated that although he had then reviewed the X-ray,

who shot Lt. Oliver. Additionally, he testified that he was under the influence of both drugs and alcohol that night. This recantation is consistent with his original statement to police, taken within 24 hours after the crime, which indicates that he saw an unidentified number of officers struggling with Workman and saw one policeman fall back. In explaining the difference between his original statement and subsequent recantation and the intervening trial testimony which he gave, Davis asserts that after he told police that he had been in the vicinity when the shooting occurred, they "corrected" his statement, threatened to arrest him if he did not testify at trial, and that the prosecutors told him what his testimony should be at trial. In addition, he claims that "late one night . . . a big white guy came and knocked on my door and he said he had a message for me . . . . that if I changed my testimony in any way that people are not allowed to tell about could disappear like I could . . . . [and t]hat's why I've been traveling and all these years." Davis claims that he has been moving from place to place in order to avoid detection by anyone involved in this case so that he would not have to tell the truth and risk danger to himself or his family.

Next, Workman argues that the prosecution knowingly excluded x-ray evidence, which the defense had previously requested, that detailed the nature of the gunshot wound suffered by Oliver. Only a few months ago, Workman came into possession of the x-ray which allegedly shows that Workman's bullet did not fragment in Oliver's body in order to cause the smaller exit wound. An x-ray of this type previously had been requested from the Medical Examiner's Office. When the prosecution made note of the existence of a chest x-ray of Lt. Oliver in one of its filings with the district court, Workman's defense team again approached the Medical Examiner's Office concerning the x-ray, and it was at that time produced. According to Workman's expert, this gunshot wound is more consistent with the use of a .38 caliber standard bullet, the type that the officers were carrying, and not a hollow-point .45 caliber bullet like the type Workman fired. The expert has indicated that hollow-point bullets normally expand upon entering the body, creating an exit

wound larger than the entrance wound, and creating a distinctive wound pattern not consistent with Oliver's injuries. Although Workman's expert was unable to testify with absolute certainty that Workman's bullet did not kill Oliver, the testimony indicated that it was highly unlikely, and Workman's expert did not have the opportunity to review the previously undisclosed x-ray at the time he was deposed.

The elements of a "fraud upon the court" are numerous. Fraud on the court is conduct: 1) on the part of an officer of the court; 2) that is directed to the judicial machinery itself; 3) that is intentionally false, wilfully blind to the truth, or is in reckless disregard for the truth; 4) that is a positive averment or a concealment when one is under a duty to disclose; 5) that deceives the court. *See Demjanjuk v. Petrovsky*, 10 F.3d 338, 348 (6th Cir. 1993). In other words, an officer of the court must have intentionally or recklessly failed to disclose information to the court that would have the result of deceiving it. We believe that the prisoner has shown us sufficient facts to create a material dispute of fact on this issue. The prosecution finally produced an x-ray which had not been disclosed to the defendant either by the prosecution or by the arm of the government from which it was requested, the Medical Examiner's Office. Both the district court's summary judgment determination and this panel's review of that decision focused on the *lack* of an x-ray which could prove or disprove the theory that Workman's bullet simply disintegrated upon entering Oliver's body. Not only did the panel ask about the existence of an x-ray at oral argument, but it specifically commented that the lack of an x-ray influenced its decision in its written disposition. In addition, there is a material dispute of fact, based on the accusations of Harold Davis, concerning whether the prosecution coerced him into perjuring himself during the course of Workman's trial. Based on these facts, the prisoner is entitled to a full evidentiary hearing to determine whether or not a fraud was committed on the district court or the panel below.

----------------

**DISSENT**

----------------

SILER, Circuit Judge, joined by NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, and BATCHELDER, Circuit Judges. The petition for a writ of habeas corpus was denied by a panel of this court in *Workman v. Bell*, 178 F.3d 759 (6th Cir. 1998), *cert. denied*, 120 S. Ct. 264 (1999). Thereafter, in March 2000, Workman filed a motion for leave to file the second habeas corpus petition and a motion for a declaration that 28 U.S.C. § 2244 does not apply to specified claims. This was denied by a panel of this court by an unpublished order. Finally, Workman filed the petition to rehear this matter en banc, which is now pending before us. Workman characterized his motion before the panel as one to "reopen." If that is a "second or successive petition" under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2244, then we do not have jurisdiction to consider this matter en banc.

> The grant or denial of an authorization by a court of appeals to file a second or successive application shall not be appealable and shall not be the subject of a petition for rehearing or for a writ of certiorari.

28 U.S.C. § 2244(b)(3)(E). The decision from *In re King*, 190 F.3d 479, 481 (6th Cir. 1999) (en banc), *cert. denied*, 120 S. Ct. 1538 (2000), supports that conclusion.

Workman's request was not to recall the mandate, but was a motion to reopen. If a motion to reopen is the equivalent of a motion to recall the mandate, such a motion "on the basis of the merits of the underlying decision can be regarded as a second or successive application for purposes of [28 U.S.C.] § 2244(b)." *Calderon v. Thompson*, 523 U.S. 538, 553 (1998).

Appellate courts agree that a post-judgment motion under Fed. R. Civ. P. 60(b) in the district court, or the

If the alleged constitutional violations are proven, a jury could have had a reasonable doubt about whether Philip Workman actually fired the weapon which killed Lt. Oliver, or whether in the alternative he was killed by "friendly fire." We would therefore REVERSE the decision of the District Court finding summary judgment in favor of the state of Tennessee and REMAND for an evidentiary hearing concerning the constitutional errors which are alleged to justify the issuance of a writ of habeas corpus in this case.

### III.  Evidentiary Hearing on the Newly Discovered Evidence

In addition to addressing the issue of fraud upon the court, the district court should also address Workman's new evidence independent of the allegation of fraud. Whether or not an intentional or reckless fraud was committed, Workman may still satisfy the less-stringent requirements of *Brady v. Maryland*, 373 U.S. 83 (1963).

In assessing the new evidence independently, the district court must find that the evidence meets the following standard: "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence . . . [and] the underlying claim, if proven and viewed in the light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense . . . ." 28 U.S.C. § 2244(b)(2).  The constitutional error in this case is the alleged violation of the rule of *Brady v. Maryland*, 373 U.S. 83 (1963). [4]  Our task is to determine whether the

---

[4] The Supreme Court in *Calderon v. Thompson*, 523 U.S. 538 (1998), made clear that the substantive standard of §2244(b)(2) must, with certain exceptions that were noted earlier, be applied to virtually any post-judgment motion in a habeas case.  This result is entirely sensible, for habeas petitioners should not be able to make an end-run around the requirements of AEDPA by simply styling their second or successive petition a "motion to reopen."  However, the *Thompson* opinion did not speak to the jurisdiction of appellate courts pursuant to § 2244(b)(3)(E), and we see no reason to read that jurisdictional provision broadly.  This is the reason that *In re King*, 190 F.3d 479 (6th Cir. 1999), *cert. denied*, 120 S.Ct. 1538 (2000), discussed above in Section I of this opinion, is not controlling.

We are not reviewing an application for permission to file a second petition or a panel's decision to permit or deny such a request.  In order to do complete justice in this death penalty case it is necessary to direct the district court to review the new facts both under a "fraud on the court" standard and independently under a newly discovered evidence standard. To prohibit such a review could otherwise lead to the execution of a person who did not in fact commit the murder for which he is sentenced

facts alleged by Workman are sufficient to make a prima facie showing that his petition satisfies this standard. *See* 28 U.S.C. § 2244(b)(3)(C).

We believe Workman has raised facts sufficient to make a prima facie showing that a reasonable jury would not have found him guilty, or alternatively would not have sentenced him to death, if the new evidence is proven and believed. First, the evidence that Davis was asked to alter his testimony before the jury is especially important given Davis's status as the only witness to testify that he actually saw Workman shoot Oliver. His recantation might have had a significant impact on the jury. Without Davis's testimony, the only witness who would have testified that he saw Oliver fall and simultaneously saw Workman with a gun in his hand was Officer Parker, whose testimony is made less credible due to the fact that he himself could possibly have fired the shot that killed Oliver, albeit unintentionally. In addition, the extraordinary story of coercion which Davis claims to have endured brings our attention to the possible efforts of the prosecution to alter the jury's perception of what actually transpired that night in 1981. If Davis's accusations are true, then certainly the prosecution must have had little faith that the testimony of the other witnesses could persuade a

---

to death.
   We interpret literally the statute depriving an en banc court or the Supreme Court of jurisdiction to review the grant or denial of permission to file a successive petition. That is, in order for an en banc court or the Supreme Court to be deprived of jurisdiction, it must literally be reviewing "the grant or denial of an authorization by a court of appeals to file a second or successive application," not a request to recall the court's mandate and reopen the case. 28 U.S.C. § 2244(b)(3)(E). For this reason, we do not regard either this court or the Supreme Court as lacking jurisdiction over this matter. To find otherwise would be to deprive both this court and the Supreme Court of the power to review serious claims of innocence. To prohibit this court and the Supreme Court from reviewing claims of innocence in death penalty habeas cases would raise serious constitutional issues under the due process clause and under Article I, § 9, which prohibits the suspension of the writ of habeas corpus.

unanimous jury beyond a reasonable doubt that Workman actually fired the fatal bullet.

The same is true of the alleged prosecutorial suppression of the x-ray which arguably shows that a bullet of the type carried by the other police officers, and not by Workman, actually killed Lt. Oliver. This physical evidence, if proven and believed, is certainly sufficient to make a prima facie showing that "no reasonable factfinder would have found [Workman] guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii). The panel of our court that originally heard this appeal did not know of the existence of an x-ray showing Oliver's wounds. It speculated that in the absence of an x-ray which would disprove the theory that only a fragment of the .45-caliber bullet exited Oliver's body, thus creating the smaller exit wound, there was no reason to conclude that Workman's bullet did not actually cause Oliver's mortal wound. *See Workman v. Bell,* 160 F.3d 276, 284-85 (6th Cir. 1998). Having made this statement, we should not talk out of the other side of our mouths now that such an x-ray is available. Our job is to act as neutral magistrates, not simply to favor the prosecution. It is incumbent upon us to allow that x-ray information to be viewed and judged in a full evidentiary hearing before the district court.

We emphasize that we are not a trial court, and we have not been given the opportunity to actually review and weigh the evidence which our hypothetical reasonable jury would have reviewed. For that reason, there is no evidence before us concerning the percentage of instances that a hollow-point bullet would fail to act in the anticipated manner and expand upon hitting the victim. The very reason for allowing an evidentiary hearing on this matter is for the district court to resume its position as factfinder and examine that evidence. Nor are we making any findings with respect to the allegations of prosecutorial misconduct beyond recognizing that they are substantial enough to make out a prima facie case as noted above.